UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MOSIMABLE A. APATA,

       Plaintiff,

   v.

OFFICER JAMES HOWARD, OFFICERS
JOHN DOES (1-10), OFFICER DAVID
FORTENBERRY, and TROY DAVIS,

       Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 05-3204
(JEI)

**OPINION**

**APPEARANCES:**

Mark W. Catanzaro, Esq.
Blason IV-Suite 208
513 S. Lenola Road
Moorestown, NJ 08057
    Counsel for Plaintiff

PARKER McCAY P.A.
By: John C. Gillespie, Esq.
   J. Brooks Didonato, Esq.
Three Greentree Centre
7001 Lincoln Drive West
P.O. Box 974
Marlton, NJ 08053
    Counsel for Defendant Officer James Howard

Troy Davis, *pro se*
19 Garrett Lane
Willingboro, NJ 08046

**IRENAS**, Senior District Judge:

    Presently before the Court are Motions for Summary Judgment

filed individually by Officer James Howard of the Willingboro

Police Department and Troy Davis, *pro se*.  Plaintiff Mosimable

Apata initiated this action pursuant to 42 U.S.C. §§ 1983, 1985,

and 1986.  Apata claims that Officer Howard violated his constitutional rights in the context of an investigatory stop and two arrests, all of which occurred during a two day span in June 2003.  Apata also asserts state law claims against Officer Howard and Davis.[1]  For the reasons stated below, the Court will grant in part and deny in part Officer Howard's Motion and will grant Davis's Motion.[2]

## I.

On June 26, 2003, several events occurred, the earliest of which did not involve Apata.  However, because the earliest incident is relevant to the events that followed, the Court begins its recitation of the facts there.

On the morning of June 26, Officer James Howard, a patrolman with the Willingboro Police Department, was dispatched to Torrington Lane in the Twin Hill Park section of Willingboro. (Def.'s Ex. A, 21:17-22-10.)  According to the dispatcher, a large group of males was assaulting a single male at that location.  (*Id.* at 21:21-22:4.)  When Officer Howard arrived, he spoke with the victim, Tyrell Baker, and a witness to the assault, Eli Johnson.  (*Id.* at 23:12-24:11.)

---

[1]  Apata's complaint further alleges that Officer David Fortenberry of the Newark Police Department is liable for malicious prosecution under 42 U.S.C. §§ 1983, 1985, and 1986 and state law.  However, no motion is pending as to these claims against Officer Fortenberry, and therefore the Court will not address them.

[2]  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.  Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

Baker and Johnson told Officer Howard that the group of males assaulted Baker by punching him, kicking him, and hitting him with sticks.  (Def.'s Ex. B.)  The victim told Officer Howard that his assailants were driving in a red Honda Civic and a red Dodge Neon before exiting the vehicles to assault him.  (*Id.*)  Another witness approached Officer Howard at the incident scene and reported that she observed the license plate number of the Dodge Neon, which she provided.  (*Id.*)

While Officer Howard was searching for the Civic and the Neon, he received a radio call informing him that there was a man with a gun in Mill Creek Park.  (Def.'s Ex. A, 30:13-31:6.)  He responded to the call and was the first officer to arrive on the scene.  (*Id.* at 31:7-32:8.)  Before the Court discusses Officer Howard's actions at Mill Creek Park, it will outline how Apata arrived at the park and came to be associated with the individuals in the Civic and the Neon.

On June 26, Apata was scheduled to graduate from Willingboro High School.  (Def.'s Ex. C, 58:9-59:3.)  That morning, Apata went to the school at about 9:00 a.m. to obtain his tickets for the graduation ceremony.  (*Id.* at 58:4-59:16.)  Upon arrival, Apata was informed that it was too early to pick up the tickets and told to return to the school later.  (*Id.* at 59:20-60:2.)  Apata went back to the school twenty minutes later and was again instructed that it was too early to obtain his tickets.  (*Id.* at

3

60:16-61:25)  At that point, Apata departed the school grounds
with friends, riding in a red Honda Civic.  (*Id.* at 62:17-63:7;
63:18-64:9; 65:11-17.)  The Civic was accompanied by a red Dodge
Neon.  (*Id.* at 81:9-22.)

As the Civic prepared to make a left turn, Apata saw another
red Honda and a green Ford Explorer.  (*Id.* at 68:8-19.)  The
passengers in those two cars were "waving" and "screaming" at the
Civic in which Apata was traveling.  (*Id.*)  The individuals in
the Civic responded in kind.  (*Id.* at 70:20-71:3.)  After the
Civic completed the left turn, it proceeded to Mill Creek Park
with the other red Honda and the green truck following behind.
(*Id.* at 70:4-19.)  Once all of the vehicles stopped inside the
park, occupants of each Honda exited the vehicles and began
arguing.[3]  (*Id.* at 72:7-73:19.)  Meanwhile, Apata observed that
an individual from the other red Honda had a gun; Apata advised
him to put the weapon away.  (*Id.* at 74:5-75:2.)  The gun
possessor ran into the woods with the gun and returned
immediately thereafter, apparently without the gun.  (*Id.* at
74:18-75:2; 75:11-15.)  As Apata and his friends prepared to
leave Mill Creek Park in the red Civic, they saw Officer Howard
running towards the assembled vehicles.  (*Id.* at 82:18-83:1.)

Upon arriving at Mill Creek Park, Officer Howard observed

---

[3] Apata did not participate in the verbal dispute.  (Def.'s Ex. C,
73:20-74:3.)

several things, including a relatively large group of individuals,[4] the two vehicles that were described to him earlier at the scene of Baker's assault, and Baker and his mother "screaming that someone had pulled a gun out on them" and pointing at the large group of individuals.[5]  (Def.'s Ex. A, 31:22-32:8.)  Although Officer Howard was responding to the report of a man with a gun, he did not immediately observe anyone with a firearm.  (*Id.* at 32:22-33:7.)  The officer ordered everyone standing outside to the ground and ordered everyone inside a vehicle, including Apata, to put their hands up outside of the cars.  (*Id.*)

Officer Howard approached the Honda Civic in which Apata was sitting with his weapon pointed towards Apata.  (*Id.* at 33:17-34:4; Def.'s Ex. C, 85:4-19.)  Apata heard Officer Howard instruct him to exit the vehicle.  (Def.'s Ex. C, 86:13-16.)  Initially, Apata responded to the officer by stating "I ain't getting out."  (*Id.* at 86:23-87:2.)  After observing at least ten additional police vehicles arriving to assist Officer Howard, Apata exited the Civic voluntarily.  (*Id.* at 87:22-88:21.)

---

[4]  Officer Howard testified at his deposition that the number of individuals exceeded ten.  (Def.'s Ex. A, 32:9-13.)

[5]  Apata was one of the individuals present at Mill Creek Park when Officer Howard arrived.  The Court notes, however, that there is no evidence in the record and no implication by any party that Apata was involved in assaulting Baker, that he had any knowledge of the assault, or that he ever possessed a gun.  The only issue before the Court is, given all of the circumstances and facts with which Officer Howard was presented, whether his actions with respect to Apata were appropriate under federal and state law.

According to Apata, Officer Howard "grabbed" him, "threw [him] on the ground and then he had his knee inside [Apata's] back." (*Id.* at 88:13-89:8.)  In the midst of this sequence, Apata alleges, Officer Howard "ripped [his] shirt right off." (*Id.* at 90:13-20.)  Finally, Apata claims that Officer Howard handcuffed him and "threw [him]" in the rear of the police vehicle. (*Id.* at 89:12-90:4.)  Officer Howard provided a contrasting version of this sequence; he testified that he "ordered" Apata to lay on the ground, handcuffed him, searched him for a weapon, and "placed" Apata in a patrol car. (Def.'s Ex. A, 37:1-13.)  No weapon or other contraband was found on Apata's person. (*Id.* at 42:5-10.)

While Apata remained in the rear of the patrol car, Willingboro police officers handcuffed a number of his companions and placed them on the ground. (Def.'s Ex. C, 89:12-90:4.) Officer Howard brought the victim of the morning assault at Torrington Lane, Tyrell Baker, to view the people in handcuffs. (*Id.* at 89:23-90:4.)  Baker informed Officer Howard that Apata was not involved in the morning incident. (*Id.* at 90:6-12.) About four minutes later, Officer Howard released Apata from the patrol car and instructed him to go home. (*Id.* at 90:6-12; 94:24-95:5.)  Apata estimated his total confinement lasted no more than ten minutes. (*Id.* at 94:20-23.)  Apata retrieved his torn shirt and began walking home with Daytomus Harris, who had also been permitted to leave by the police officers. (*Id.* at

95:11-96:12.)  Contrary to Apata's testimony about an orderly
exit from the park, Officer Howard testified that Apata was
yelling and initially refused to leave.  (Def.'s Ex. A, 46:10-
18.)  Officer Howard confirmed that Apata ultimately left the
incident scene.  (*Id.* at 48:25-49:4.)

     With any imminent threat at Mill Creek Park defused, Apata
(on foot) and Officer Howard (in his vehicle) were each leaving
the park when a second interaction between the pair ensued.
(Def.'s Ex. C, 96:1-97:2.)  According to Apata, Officer Howard
exited his vehicle and told Apata "I need to speak to you for a
second." (*Id.* at 96:13-97:2.)  Apata explained that he did not
wish to speak with Officer Howard and thus attempted to walk
away, but Officer Howard blocked his walking path three times.
(*Id.* at 97:4-21.)  After Apata's third attempt to walk past
Officer Howard, the officer arrested him for disorderly conduct.
(*Id.*)  Officer Howard disputes the foregoing description of the
events preceding Apata's arrest, instead testifying that he
arrested Apata for yelling, cursing, and behaving in a disorderly
fashion.  (Def.'s Ex. A, 51:1-52:4.)  Apata claims that Officer
Howard carried out the arrest by pushing him onto the hood of the
police vehicle, applying handcuffs, throwing him into the rear of
the police car, and slamming the car door onto his left knee,
which had been protruding through the open door.  (Def.'s Ex. C,
98:3-13.)  Officer Howard denies applying any physical force to

Apata beyond handcuffing him.  (Def.'s Ex. A, 53:3-4.)  Apata was transported to the police station where he was detained for no more than thirty minutes and issued a citation for disorderly conduct.  (Def.'s Ex. C, 102:11-15; 104:14-17.)  After being released from the police station, Apata walked home.  (*Id.* at 107:17-108:1.)

Apata then returned to Mill Creek Park at the request of his friend, Aldo Palmer, to retrieve Palmer's red Dodge Neon.[6] Driving the Neon, Apata returned to Willingboro High School to pick up his graduation tickets.  (*Id.* at 108:15-109:18.) Upon exiting the school, Apata was confronted by two men he had never met before, whom he later learned were co-Defendants David Fortenberry and Troy Davis. (*Id.* at 109:20-110:6; 113:8-13.) According to Apata, one of the men accused Apata of attacking his nephew and called Apata a "little nigger." (*Id.* at 109:20-110:6.)  Apata responded that he was not involved in attacking the man's nephew.  (*Id.*)  After a further exchange of words, Davis threw the keys to the red Neon onto the roof of the school. (*Id.* at 116:17-117:14.)  At that point, Apata ran back inside the school building.  (*Id.* at 117:16-19.)  Apata then returned outside; he and the two men resumed directing hostilities at each

---

[6] Aldo Palmer was arrested at Mill Creek Park for his alleged involvement in the morning assault on Tyrell Baker.  (Def.'s Ex. A, 47:24-48:16.)  Palmer was transported from the park to the Willingboro police station.  (*Id.* at 49:5-14.)  While Apata was likewise detained at the police station, Palmer gave Apata the keys to the red Neon.  (Def.'s Ex. C, 106:21-107:11.)

other.  (*Id.* at 117:16-21; 120:21-121:18.)  All three men assumed
fighting postures, but no physical altercation ultimately ensued.
(Def.'s Ex. D; Def.'s Ex. C, 119:24-25.)  School security
personnel intervened to separate Apata and the two men; two
Willingboro police officers, neither of whom was Officer Howard,
arrived shortly thereafter.  (Def.'s Ex. C, 123:23-124:20;
125:20-126:8.)  The officers spoke to all three men briefly but
no arrests were made.  (*Id.* at 124:13-125:2; 126:17-127:6.)

Later in the afternoon, still on June 26, Fortenberry went
to the Willingboro police station to file a criminal complaint
against Apata for threats purportedly made during the
confrontation at the high school.  (Def.'s Ex. E, 31:15-32:6.)
Officer Howard directed Fortenberry to return the next day if he
wished to file a complaint because the officer was occupied with
paperwork related to the Mill Creek Park incident.  (*Id.* at 32:7-
33:5.)  Apata also went to the Willingboro police station on June
26 with the intent of filing a complaint about his dispute with
Fortenberry and Davis, but he did not ultimately do so.  (Def.'s
Ex. C, 141:14-25.)

The next day, June 27, Fortenberry and Davis returned to the
Willingboro police station.  (Def.'s Ex. E, 35:2-12.)  They filed
separate affidavits, each certifying that Apata threatened to
summon gang members from Trenton to kill them.  (*Id.*; Def.'s Ex.
F; Def.'s Ex. G.)  Apata is uncertain of exactly what he said to

the two men during the argument, but denies threatening their lives.  (Def.'s Ex. C, 121:19-122:2.)  He did recall telling the two men he would "F [them] up."  (*Id.* at 121:12-18.)  Principal Tull of Willingboro High School pointed to Fortenberry and Davis as the instigators of the confrontation, but admitting hearing Apata say "he was going to kill [Fortenberry]."  (Def.'s Ex. D.)

Officer Howard read the sworn statements and Apata's criminal history to a magistrate over the telephone.  (Def.'s Ex. A, 75:3-77:5.)  The judge determined there was probable cause to support a charge of terroristic threats and issued a warrant for Apata's arrest, which Officer Howard executed at Apata's home on the same day.  (*Id.* at 77:6-15.)  Apata was transported to the Willingboro police station and then to the Burlington County Jail where he remained for six hours, until posting bail.  (Def.'s Ex. C, 136:13-20; 138:14-139:12.)  Ultimately, Apata entered into a mediation agreement with Fortenberry and Davis whereby the terroristic threats and disorderly conduct charges were resolved without convictions.  (Def.'s Ex. J.)

As a result of the June 26 arrest, Apata reports continuing soreness in his left knee.  (Def.'s Ex. C, 105:10-20.)  In response to interrogatories, Apata claimed that he suffered bruises and contusions on his knee and wrists during the June 26 arrest, but he stated during his deposition that he did not suffer any knee bruising and did not mention any trauma to his

10

wrists.  (Def.'s Ex. I ¶ 10; Def.'s Ex. C, 105:5-9.)  Apata
indicated that he fears the Willingboro police as a result of the
foregoing events and is hesitant to leave his home because of
that fear.  (Def.'s Ex. I. ¶ 10; Def.'s Ex. C, 151:25-153:2.)
Lastly, Apata claims his "reputation has been soiled."  (Def.'s
Ex. I. ¶ 10.)

## II.

"Under Rule 56(c), summary judgment is proper 'if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law.'"
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed.
R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must
construe the facts and inferences in a light most favorable to
the nonmoving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794
F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on
which the nonmoving party bears the burden of proof, the burden
on the moving party may be discharged by 'showing'—that is,
pointing out to the district court—that there is an absence of
evidence to support the nonmoving party's case.'"  *Conoshenti v.
Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004)
(quoting *Celotex*, 477 U.S. at 325).  The role of the Court is

"not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.

Officer Howard raises a procedural concern that requires attention before proceeding to the merits of this action. Specifically, he argues that Apata failed to provide a statement of material facts in conformity with Local Civil Rule 56.1. (Def.'s Reply Br. at 2.)  Thus, according to Officer Howard, Apata cannot defeat this motion for summary judgment. (*Id.*)

At the time the litigants submitted their filings, Rule 56.1 required each party contesting a motion for summary judgment to submit a statement of material facts that specifically identifies "material facts as to which there exists or does not exist a genuine issue."  L. Civ. R. 56.1 (2008) (amended Sep. 4, 2008).[7] Rule 56.1 is intended to facilitate the expeditious resolution of matters before the Court. *See Cataldo v. Moses*, 361 F.Supp.2d 420, 426 (D.N.J. 2004).  When parties adhere to the Rule, the Court's burden to scour the record to identify the pertinent facts is commensurately reduced. *See Comose v. N.J. Transit Rail Operations, Inc.,* No. 98-2345, 2000 WL 33258658, at *1 (D.N.J.

---

[7]  During the pendency of this litigation, Rule 56.1 was amended, effective September 4, 2008.

12

Oct. 6, 2000).  Although compliance with Rule 56.1 is mandatory, the Court retains discretion to excuse a party's non-compliance when the interests of justice so require, particularly when there is no evidence of bad faith.  *Kee v. Camden County,* No. 04-0842, 2007 WL 1038828, at *5 (D.N.J. Mar. 30, 2007).

Here, Apata submitted a paragraph-by-paragraph response to Officer Howard's Rule 56.1 statement.  The Court agrees with Officer Howard that Apata's document included a number of ambiguous assertions and raised legal arguments that have no place in a Rule 56.1 statement.  Although Apata's filing could be more clear, the Court was provided with sufficient guidance to understand his version of the facts and there is no indication of bad faith on his part.  Thus, the Court exercises its discretion to proceed to the merits of this motion.

**IV.**

Apata raises a series of federal claims against Officer Howard pursuant to 42 U.S.C. §§ 1983, 1985, and 1986.  Those claims include excessive force (Count I), unlawful detention (Count II), false arrest (Count IV), and malicious prosecution (Count V).

**A.**

First, the Court will dismiss all claims against Officer Howard brought via 42 U.S.C. §§ 1985 and 1986.  A plaintiff proceeding under § 1985 must allege, among other elements, the

existence of a conspiracy motivated by race or class based animus. *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997). Under § 1986, a party is liable for neglectfully failing to prevent a violation of § 1985. *See* 42 U.S.C. § 1986. Thus, any culpability under § 1986 is necessarily derivative to liability under § 1985. *Clark v. Clabaugh*, 20 F.3d 1290, 1295, 1295 n.5 (3d Cir. 1994).

At no point does Apata's complaint allege the existence of a conspiracy, let alone a conspiracy actuated by race or class based animus. Therefore, Apata's claims pursuant to § 1985 fail as a matter of law. It follows that Apata's claims under § 1986 are without merit. Summary judgment will be granted to Officer Howard on all claimed violations of §§ 1985 and 1986.

The remainder of Apata's federal claims against Officer Howard are pursuant to 42 U.S.C. § 1983. Section 1983 "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). Police officers are cloaked with government authority and thus are within the purview of § 1983. *Id.* However, a police officer who violates § 1983 can escape liability if the officer is entitled to qualified immunity. *Id.* Qualified immunity provides broad protection to government officials in the performance of their duties by shielding from

civil liability "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Couden v. Duffy*, 446 F.3d 483, 501 (3d Cir. 2006) (Weis, J., dissenting)).

The Third Circuit recently explained the two step procedure to determine whether a police officer is entitled to qualified immunity in the Fourth Amendment context. *See id.* at 206-07. The initial step is to determine whether "the officer's conduct violated a constitutional right[,]" thereby giving rise to potential liability under § 1983. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the first inquiry is answered in the affirmative, a court must proceed to the second step, which considers "whether the right that was violated was clearly established[.]" *Id.* at 207. For ease of organization, the Court will complete the first step of the qualified immunity analysis as to all federal claims against Officer Howard before proceeding to the second step, if necessary.

### B.

Count I alleges that Howard used unreasonable and excessive force against Apata in violation of the Fourth Amendment and § 1983. Whether the use of force by an officer violates the Fourth Amendment is determined via the "objective reasonableness standard[.]" *Id.* at 206 (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)) (internal quotation marks omitted) (alteration in original). The objective reasonableness standard considers "the

reasonableness of the officer's belief as to the appropriate level of force[,] which should be judged from [the officer's] on-scene perspective, and not in the 20/20 vision of hindsight." *Id.* at 206-07 (quoting *Saucier*, 533 U.S. at 205) (internal quotation marks omitted) (alterations in original).  This is a totality of the circumstances inquiry that incorporates such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 207 (quoting *Graham*, 490 U.S. at 396).

Additional considerations can include "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

The analysis may also consider whether the plaintiff suffered physical injury, but this factor should not be deemed dispositive in favor of either party.  *See Grayer v. Twp. of Edison*, 198 F.App'x 203, 209 (citing *Sharrar*, 128 F.3d at 822). The Court must be mindful that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's

16

chambers, violates the Fourth Amendment." *Id.* at 208 (quoting Graham, 490 U.S. at 396). Thus, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Kopec*, 361 F.3d at 777 (quoting *Graham*, 490 U.S. at 396-97).

The Court recognizes that "[t]he reasonableness of the use of force is normally an issue for the jury." *Ference v. Twp. of Hamilton*, 538 F.Supp.2d 785, 804 (D.N.J. 2008) (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004)). That said, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Id.* (quoting *Kopec*, 361 F.3d at 777).

Apata cites two separate physical interactions with Officer Howard that must be evaluated for compliance with the objective reasonableness standard: (1) the search following Apata's exit from the Civic and (2) the contact intertwined with the June 26 arrest for disorderly conduct. For the reasons explained below, a genuine issue of material fact exists as to whether Officer Howard employed excessive force during the latter incident but

not the former.

The first incident occurred shortly after Officer Howard arrived at Mill Creek Park in response to a report of a man with a gun. Although Apata knew the gun possessor had taken the firearm to the woods, Officer Howard did not have the benefit of that knowledge. Thus, the officer's subsequent actions must be viewed in light of his reasonable belief that someone at the incident scene had a gun. Possession of a firearm in a public place is a serious crime that poses a significant threat to the safety of everyone assembled. Officer Howard was outnumbered and under pressure to locate the weapon as quickly as possible. Faced with these emergent considerations, Officer Howard acted sensibly by ordering all persons standing to the ground and all persons inside of parked vehicles to place their hands up.

After issuing that order, Officer Howard instructed Apata to exit the Civic. Apata initially refused to exit; his resistance reasonably suggested to Officer Howard that some degree of force would be necessary to subdue him. When Apata ultimately exited the Civic, Officer Howard reasonably believed Apata posed a potential threat because Apata was previously non-cooperative. This is particularly true because the firearm was still unaccounted for at the time Apata stepped out of the vehicle. Although not dispositive, it bears mention that Apata was not injured in the course of this physical interaction with Officer

Howard.  Thus, even if Apata established at trial that Officer Howard "grabbed" him, "threw [him] on the ground and had his knee inside [Apata's] back[,]" handcuffed him, and tore Apata's shirt in the process, no reasonable factfinder could disagree that Officer Howard's conduct was objectively reasonable under the uncertain and rapidly evolving circumstances the officer was faced with.  Therefore, to the extent that Count I alleges that this search involved excessive force in violation of the Fourth Amendment, it fails as a matter of law and without reaching the second step of the qualified immunity analysis.

The latter incident occurred while Apata was departing the park.  Taking the record in the light most favorable to Apata, he was walking away from the park when Officer Howard initiated a conversation with Apata and then physically blocked Apata's walking path.  Unlike the earlier gun report, Officer Howard was not presented with a crime of any severity and there was no danger to the officer or bystanders.  Officer Howard knew Apata was not armed because he had searched Apata minutes earlier. Apata was accompanied by only one other individual, Daytomus Harris.  Nevertheless, Apata alleges, Officer Howard pushed him onto the hood of the police vehicle, applied handcuffs, threw him into the rear of the police car, and slammed the car door on his left knee; pain in Apata's knee persists to the time of this litigation.  If Apata can establish the veracity of the foregoing

19

allegations at trial, a reasonable jury could conclude that
Officer Howard employed excessive force in violation of the
Fourth Amendment and actionable under § 1983.  However, it
remains to be determined whether Officer Howard is shielded from
any potential damages by qualified immunity.  *See infra* pt. IV,
E.

**C.**

Next, Apata contends he was falsely arrested and unlawfully
detained[8] (falsely imprisoned).[9]  Although the complaint is
ambiguous, Apata's brief argues that he was falsely arrested and
imprisoned on three distinct occasions: (1) upon initial exit
from the Civic; (2) the June 26 arrest for disorderly conduct;
and (3) the June 27 arrest for terroristic threats.

(1)

Although Apata claims that his initial detention upon
exiting the Civic was a false arrest, not every seizure by a
police officer is an "arrest" such that probable cause is

---

[8] In Count IV, Apata claims he was falsely arrested in contravention of
the Fourth and Fourteenth Amendments.  (Compl. ¶ 74.)  Count II alleges
unlawful detention in violation of the due process guarantees of the Fourth
and Fifth Amendments.  (Compl. ¶ 64.)  Pursuant to well-settled Supreme Court
doctrine, the protections against governmental misconduct afforded by the
Fourth and Fifth Amendments are enforceable against state actors via the
Fourteenth Amendment.  *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964); *Ker v.
California*, 374 U.S. 23, 30 (1963).  Thus, the Court interprets Counts II and
IV of Apata's complaint as alleging unconstitutional behavior by government
actors in contravention of the Fourth Amendment, as applicable against Officer
Howard by way of the Fourteenth Amendment.

[9] "Unlawful detention" and "false imprisonment" are synonymous terms in
the context of a § 1983 action.  *See Potts v. City of Phila.*, 224 F.Supp.2d
919, 936 (E.D. Pa. 2002).

20

required to preserve its constitutionality.

Under the doctrine of *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer is permitted to detain an individual, without probable cause, pursuant to a valid investigatory stop. *See Terry*, 392 U.S. at 27.  Such a detention is constitutionally permitted so long as the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *U.S. v. Yamba*, 506 F.3d 251, 255 (3d Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

In performing an investigatory stop, police officers "may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *U.S. v. Thomas*, 58 F.App'x 915, 917 (3d Cir. 2003) (quoting *U.S. v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995)) (internal quotation marks omitted).  Neither the use of handcuffs nor pointing a firearm at a person necessarily indicates that a suspect is arrested for Fourth Amendment purposes.  *See id.* at 918 (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995)).  Instead, the legal effect of displaying a weapon or applying handcuffs is judged based on the circumstances the officer was presented with.  *Id.*  (citing *Baker*, 50 F.3d at 1193).  Finally, the weight of Third Circuit authority indicates that investigatory stops lasting less than one hour are within

21

the purview of *Terry* and do not constitute arrests requiring probable cause. *Brown v. City of Phila.*, No. 07-0192, 2008 WL 269495, at *7 (E.D. Pa. Jan. 29, 2008) (collecting cases).

Here, Officer Howard cites a series of facts and inferences that provided ample justification to subject Apata to a *Terry* stop on June 26. The officer was responding to a report of a firearm in a public park. To the best of his knowledge, the gun was still present in the park when he arrived; the identity of its possessor was unknown to the officer. Among the vehicles at the park, Officer Howard recognized the red Civic and red Neon reportedly involved in the unsolved morning assault at Torrington Lane. This inferentially indicated to Officer Howard that the persons inside those two cars may have been involved in attacking Tyrell Baker earlier that morning.

Based on those articulable facts and inferences, Officer Howard was warranted in an intrusion designed to determine the location of the firearm and ascertain whether the current occupants of the Neon and Civic were responsible for battering Tyrell Baker. Apata's initial refusal to exit the Civic further justified a brief detention for investigatory purposes. Officer Howard placed Apata in the police vehicle for only ten minutes, far short of the time period that has generally been required to elevate an investigatory stop into an arrest. Based on the foregoing, it is manifest that Officer Howard's initial seizure

22

of Apata was a permissible investigatory stop, not an arrest.
When there was no arrest at all, there can be no constitutional
tort for false arrest.

(2)

The Court now turns to Apata's claims that he was falsely
arrested and imprisoned on June 26 for disorderly conduct and on
June 27 for terroristic threats.  The causes of action for false
arrest and false imprisonment are interrelated.  First, "[a]n
arrest made without probable cause creates a cause of action for
false arrest under 42 U.S.C. § 1983." *O'Connor v. City of
Phila.*, 233 F.App'x 161, 164 (3d Cir. 2007) (citing *Dowling v.
City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)).  If an arrest
occurs without probable cause, "the arrestee has a claim under §
1983 for false imprisonment based on a detention pursuant to that
arrest." *Id.* (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628,
636 (3d Cir. 1995)).  It follows that the presence of probable
cause is a defense to allegations of both false arrest and false
imprisonment under § 1983. *Berko v. Borough of Spring Lake*, No.
06-4366, 2008 WL 2557513, at *6 (citing *Groman*, 47 F.3d at 636;
*Dowling*, 855 F.2d at 141).

As the presence or absence of probable cause is the
dispositive consideration in analyzing these claims, it is
necessary to articulate the meaning of that term.  The Third
Circuit has repeated that "[p]robable cause to arrest exists when

23

the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). Issues of probable cause in § 1983 actions are generally submitted to a jury, but a district court may rule "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding[.]" *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

Apata complains that he was falsely arrested for disorderly conduct on June 26. To ascertain whether Officer Howard had probable cause for that arrest, the Court looks to the statutory definition of the relevant crime. *See, e.g.*, *Pomykacz v. Borough of West Wildwood*, 438 F.Supp.2d 504, 510-11 (D.N.J. 2006) (referring to the text of pertinent criminal statute to determine whether law enforcement officer was justified in finding probable cause to arrest suspect for stalking). The New Jersey disorderly conduct statute provides:

> a. Improper behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
> > (1) Engages in fighting or threatening, or in violent or tumultuous behavior; or
> > (2) Creates a hazardous or physically dangerous

24

> condition by any act which serves no legitimate
> purpose of the actor.
> b. Offensive language. A person is guilty of a petty
> disorderly persons offense if, in a public place,
> and with purpose to offend the sensibilities of a
> hearer or in reckless disregard of the probability
> of so doing, he addresses unreasonably loud and
> offensively coarse or abusive language, given the
> circumstances of the person present and the setting
> of the utterance, to any person present.
>
> "Public" means affecting or likely to affect persons
> in a place to which the public or a substantial
> group has access; among the places included are
> highways, transport facilities, schools, prisons,
> apartment houses, places of business or amusement,
> or any neighborhood.

N.J. Stat. Ann. § 2C-33:2.

According to Apata, he was leaving the park and not causing any disturbance when Officer Howard initiated a conversation with him.  Apata indicated he did not wish to speak with the officer and attempted to continue walking away.  Nevertheless, Apata alleges, Officer Howard blocked his walking path repeatedly before arresting him for disorderly conduct.  Accepting Apata's representations that he was not misbehaving, there is a genuine issue of material fact as to whether Officer Howard had probable cause to arrest him for violating a statute that proscribes unruly behavior and offensive language.

To complete the arrest, Officer Howard detained Apata in a police vehicle and transported him to police headquarters.  Those additional steps, if undertaken without probable cause for the initial arrest, would permit a reasonable jury to find Apata was

falsely imprisoned.  Notwithstanding these findings, it remains to be determined whether Officer Howard is entitled to qualified immunity even in the absence of probable cause to arrest Apata for disorderly conduct.  *See infra* pt. IV, E.

Next, Apata argues he was falsely arrested on June 27 for directing terroristic threats towards Fortenberry and Davis. Unlike the June 26 arrest, the June 27 arrest was pursuant to a warrant authorized by a magistrate.  Because a warrant was issued, Officer Howard contends that he is absolutely insulated from liability.  The officer's argument is unsustainable; the Third Circuit has ruled that "an erroneously issued warrant *cannot* provide probable cause for an arrest."  *Berg v. County of Allegheny*, 219 F.3d 261, 269-70 (3d Cir. 2000) (emphasis added). Instead, a plaintiff may succeed in an action for false arrest, notwithstanding a warrant, if he:

> shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; (2) that such statements or omissions are material, or necessary, to the finding of probable cause.

*Pomykacz*, 438 F.Supp.2d at 510 (quoting *Meyers v. Wolkiewicz*, 50 F.App'x 549, 552 (3d Cir. 2002)) (internal quotation marks omitted).  Thus, the Court considers whether there is evidence that Officer Howard recklessly or intentionally made false statements or omissions to the magistrate.

Here, there is no indication in the record that Officer Howard engaged in such behavior.  The officer simply read the contents of the affidavits over the telephone to a municipal judge.  Apata essentially admits that Officer Howard did not make false statements or material omissions, claiming only that Officer Howard "was not justified in relying on the affidavits of probable cause executed by Fortenberry and Davis, the alleged facts of which were not investigated by Howard prior to Apata's arrest."  (Pl.'s Resp. Br. at 10.)  Apata seems to argue that Officer Howard erred by relying on the affidavits because "a factual issue exists as to whether Apata threatened Fortenberry and Davis or whether Fortenberry and Davis threatened Apata." (*Id.*)  According to Apata, his reasoning is supported by his own account of the events at the high school, as well as an affidavit signed by Willingboro High School Principal Robert Tull, which tends to corroborate Apata's version of the incident. (*Id.* at 10-11)

Apata's argument omits crucial details.  First, only Fortenberry and Davis executed affidavits claiming they were threatened; Apata did not file a police report claiming that he was threatened by the two men.  Second, Principal Tull's statement, which Apata purports undermined Officer Howard's actions on June 27, 2003, was not authored by the principal until October 7, 2003 (*See* Def.'s Ex. D.)  Nothing in the record

27

indicates that Officer Howard had any reason to distrust the affidavits executed by Fortenberry, himself a Newark police officer, or Davis.  Those affidavits contained substantially similar accounts of the confrontation with Apata at the high school and a magistrate found the requisite probable cause for an arrest.  In light of the foregoing, no reasonable factfinder could disagree that Officer Howard acted within legal boundaries in obtaining and executing the warrant for Apata's arrest on June 27.

Defendant Howard's motion for summary judgment on Counts II and IV, false arrest and false imprisonment, will be granted insofar as it pertains to the investigatory stop of June 26 and the terroristic threats arrest on June 27; the motion will be denied to the extent it relates to the disorderly conduct arrest on June 26.

### D.

Next, Apata claims he was maliciously prosecuted in contravention of § 1983.[10]  Specifically, he argues his constitutional rights were violated when Officer Howard commenced criminal proceedings against him for disorderly conduct.  The

---

[10]  As the Constitutional basis for this assertion, Apata cites his "due process rights to be free from prosecution except upon a determination of probably [sic] cause" and, "[i]n particular . . . the rights and privileges and immunities guaranteed to plaintiff by the Fourteenth Amendment to the United States Constitution."  (Compl. ¶¶ 81, 82.)  The Court interprets this claim as a textual reference to the protection from prosecution without probable cause afforded by the Fourth Amendment, applicable to state actors via the Fourteenth Amendment.  *See, e.g.*, *Ker v. California*, 374 U.S. 23, 30.

Third Circuit recently articulated the elements of a § 1983 action for malicious prosecution under the Fourth Amendment, as follows:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007) (citing *Estate of Smith*, 318 F.3d at 521).

Apata's malicious prosecution claim must fail because he is unable to establish the second or fifth elements.  A compromise by an accused with the alleged victim of a crime to avoid the spectre of a conviction is not sufficiently favorable to satisfy the second element.  *See Mitchell v. Guzick*, 138 F.App'x 496, 500 (3d Cir. 2005).  The requisite deprivation of liberty pursuant to legal process requires more than simply an arrest.  *See Wiltz v. Middlesex County Office of the Prosecutor*, 249 F.App'x 944, 949 (3d Cir. 2007).  To that end, the Third Circuit upheld the dismissal of a malicious prosecution claim by the district court when the plaintiff alleged she was arrested but failed to "allege that she was incarcerated, required to post bond, maintain contact with Pretrial Services, refrain from traveling, or that she endured any other 'post-indictment' deprivation of liberty as a result of the legal proceedings."  *Id.* (citing *Gallo v. City of*

*Phila.*, 161 F.3d 217, 222 (3d Cir. 1998)).

In this case, Apata stated that his mediation agreement with Fortenberry and Davis included the dismissal of all criminal charges against him stemming from the incidents of June 26 and 27. (Pl.'s R. 56.1 Resp. Stmt. ¶ 62.)  This compromise agreement foreclosed the possibility that Apata would be convicted of the charged crimes, but it is not adequately favorable to sustain his action for malicious prosecution.  Also, Apata has not alleged a sufficient deprivation of liberty pursuant to legal process by merely citing his arrest and a thirty minute processing period at police headquarters, after which he was released.[11]  As Apata cannot satisfy the elements of the cause of action for malicious prosecution under § 1983, Officer Howard will be granted summary judgment as to Count V.[12]

---

[11] The record does not indicate Apata was required to post bail or subjected to any other conditions of release after being charged with disorderly conduct on June 26, 2003.

[12] Count V of the complaint seemingly raises only a malicious prosecution claim under §§ 1983, 1985, and 1986.  (Compl. ¶ 81.)  Nevertheless, Apata's response brief suggests that his action against Officer Howard for malicious prosecution is pursuant to state common law.  (Pl. Resp. Br. at 15.)  To some extent, the elements of a malicious prosecution claim under New Jersey law differ from the elements of a § 1983 malicious prosecution action.  *Compare Helmy v. City of Jersey City*, 836 A.2d 802, 806 (N.J. 2003) *with Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007).  However, a malicious prosecution plaintiff under either law must prove that the underlying criminal proceeding was terminated favorably to the plaintiff.  *See Helmy*, 836 A.2d at 806; *Johnson*, 477 F.3d at 81-82.  Like the Third Circuit, New Jersey authorities do not regard a compromise with an accused as a favorable termination for purposes of a subsequent malicious prosecution action.  *See Pascussi v. Twp. of Irvington*, 46 F.App'x 114, 116 (3d Cir. 2002) (quoting *Rubin v. Nowak*, 590 A.2d 249, 250-51 (N.J. Super. Ct. App. Div. 1991)).

**E.**

As explained above, there are material issues of disputed fact as to whether Officer Howard violated Apata's constitutional rights in the context of the June 26 arrest for disorderly conduct.  Specifically, disputed issues remain as to Count I (excessive force), Count II (false imprisonment), and Count IV (false arrest).  Thus, the Court proceeds to the second step dictated by the qualified immunity analysis, which asks "whether the right that was violated was clearly established[.]" *Curley*, 499 F.3d at 207.

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier*, 533 U.S. at 202).  If a police officer violates a clearly established right, he is not entitled to qualified immunity and can be compelled to answer in damages.  *See id.*  If, on the other hand, the police officer violated a constitutional right but "made a reasonable mistake about the legal constraints on his actions[,]" he is immune from suit on the basis of qualified immunity.  *Id.*

The qualified immunity inquiry is intended "to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* (quoting *Saucier*, 533 U.S. at 205).  The Third Circuit has unequivocally stated that the court, not the jury, is the appropriate arbiter of whether an officer is

31

entitled to qualified immunity.  *Id.* at 211.  When the factual
record permits, the preferred approach is to resolve questions of
qualified immunity during the early stages of litigation, but
early resolution is not always practicable.  *See id.* at 208.
When key historical facts are disputed, the Court is obliged to
defer a decision on qualified immunity until a more appropriate
juncture, possibly with the assistance of an advisory jury.[13]
*See id.*

   The current record contains significant disputed factual
issues about what led Officer Howard to arrest Apata for
disorderly conduct on June 26.  Although qualified immunity
provides broad protection for the reasonable mistakes of police
officers, those disputed facts preclude a finding that Officer
Howard is entitled to qualified immunity at this time.  If Apata
was indeed attempting to peaceably exit the park, Officer Howard
did not reasonably err in finding probable cause to arrest Apata,
detain him, and employ physical force in carrying out the arrest.
Of course, the foregoing description of Officer Howard's conduct
is that of Apata; the officer provides a contrasting picture of

---

   [13] The Third Circuit has suggested that a jury may serve an advisory
capacity in the context of a qualified immunity inquiry by resolving disputed
issues as to historical facts.  This approach is particularly appropriate when
the District Court's qualified immunity analysis hinges on "tightly
intertwined issues of fact and law[.]"  *Curley*, 499 F.3d at 211 n.12.  In
practice, "District Courts may use special interrogatories to allow juries to
perform this function."  *Id.* at 210 (quoting *Carswell v. Borough of Homestead*,
381 F.3d 235, 242 (3d Cir. 2004)).  If a court elects to use an advisory jury,
the final determination of whether qualified immunity applies still rests
entirely with the court and may not be delegated to the jury.  *See id.* at 211.

the events precipitating Apata's arrest.  The Court expressly reserves the right to reconsider the applicability of qualified immunity when the pertinent disputed factual issues are resolved.

**V.**

Apata also raises state law claims pertaining to the events of June 26 and June 27.  Counts III and VIII allege that Officer Howard is liable for tortious assault, battery, and the intentional infliction of emotional distress ("IIED").  Count VII contends that Troy Davis is culpable for malicious prosecution.

**A.**

Turning first to the assault and battery allegations against Officer Howard, Apata claims "two separate occasions" of offensive physical contact.  (Compl. ¶ 66.)  The factual underpinnings of these allegations mirror Apata's federal claims. While again denying Apata's factual allegations, Howard raises the additional defense of the New Jersey Tort Claims Act's so-called "verbal threshold."  The parties agree that police officers are privileged to commit a battery in the course of official duties.  (Def.'s Br. at 16; Pl.'s Resp. Br. at 13.) Likewise, both recognize that the privilege is negated if excessive force is used.  (Def.'s Br. at 16; Pl.'s Resp. Br. at 13.)

In a recent case alleging police misconduct, the Supreme

33

Court of New Jersey interpreted the statutory law governing whether a plaintiff can recover from a law enforcement officer under the Tort Claims Act.  *See Toto v. Ensuar*, 952 A.2d 463, 469 (N.J. 2008).  First, N.J. Stat. Ann. § 59:9-2(d), known as the "verbal threshold," states:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.

*Toto*, 952 A.2d at 469 (quoting N.J. Stat. Ann. § 59:9-2(d)).  In addition to proving $3,600 in medical treatment expenses, a plaintiff must satisfy a two-pronged inquiry to recover for pain and suffering under this section, as follows: "[a] plaintiff must show (1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial."  *Id.* (quoting *Knowles v. Mantua Twp. Soccer Ass'n*, 823 A.2d 26, 29 (N.J. 2003)) (internal quotation marks omitted).  An exception to the verbal threshold requirement is included in the statutory scheme, providing as follows:

> a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or

34

> *constituted a crime, actual fraud, actual malice or*
> *willful misconduct.*
>
> b. *Nothing in this act shall exonerate a public*
> *employee from the full measure of recovery* applicable
> to a person in the private sector *if it is established*
> *that his conduct was outside the scope of his*
> *employment or constituted a crime, actual fraud, actual*
> *malice or willful misconduct.*

*Id.* (quoting N.J. Stat. Ann. § 59:3-14).  This latter section is

an explicit exception to the verbal threshold, intended so that

"a public employee guilty of outrageous conduct cannot avail

himself of the limitations as to liability and damages contained

in [the Tort Claims Act]."  *Id.* (quoting *Velez v. City of Jersey*

*City*, 850 A.2d 1238, 1243 (N.J. 2004)).

Here, the initial investigatory stop by Officer Howard did

not involve excessive force, for reasons described above at

length.  Thus, although the contact was undesired from Apata's

standpoint, Officer Howard was privileged to make that contact

pursuant to a lawful investigatory stop.  In the alternative, any

assault and battery claim as to the investigatory stop is

foreclosed by the Tort Claims Act, as there is neither a record

of injury or disability suffered by Apata, nor any indication of

willful misconduct by Officer Howard in performing the

investigatory stop.

The June 26 disorderly conduct arrest poses more complicated

questions.  As established above, a material issue of disputed

fact exists as to whether Officer Howard employed excessive force

when he arrested Apata on June 26, thereby negating any claim of privilege.  However, the New Jersey Tort Claims Act demands more before the officer can be held liable for tortious conduct.  Apata cannot satisfy either the financial threshold or the two-pronged inquiry of N.J. Stat. Ann. § 59:9-2(d).  Apata's sole alleged injury is a sore knee which is painful at times, but has never been examined by a physician.  Even if Apata's complaints were verified, this pain fails to meet the statutory requirements as articulated in *Toto v. Ensuar*.

Thus, Apata's last resort is to escape the operation of § 59:9-2(d) entirely by establishing that Officer Howard's physical contact with him "constituted a crime, actual fraud, actual malice or willful misconduct."  N.J. Stat. Ann. § 59:3-14.  In the context of the Tort Claims Act, willful misconduct is defined as the knowing commission of a forbidden act, a level of culpability requiring "much more than an absence of good faith and much more than negligence."  *Hill v. Algor*, 85 F.Supp.2d 391, 411-12 (D.N.J. 2000) (quoting *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F.Supp. 808, 830 (D.N.J. 1993)) (internal quotation marks omitted).

As considered at length above, the record is disputed as to what transpired between Apata and Officer Howard that resulted in the June 26 arrest.  Apata testified, essentially, that Officer Howard initiated that confrontation and the accompanying unwanted

36

physical contact without a lawful basis for doing so.  If proven as alleged, a reasonable jury could conclude that Officer Howard engaged in willful misconduct within the meaning of § 59:3-14.[14] Thus, a material issue remains as to Count III, assault and battery, but limited to the temporal period corresponding to the June 26 arrest.

**B.**

Apata's final claim against Officer Howard alleges IIED.  To succeed, a plaintiff in such an action must prove "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe."  *Tarr v. Ciasulli*, 853 A.2d 921, 924 (N.J. 2004) (quoting *Buckley v. Trenton Saving Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988)).  Intentional and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Buckley*, 544 A.2d at 863.  The strata of emotional distress to sustain an IIED action is a degree "so severe that no reasonable [person] could be expected to endure it." *Tarr*, 853 A.2d at 924 (quoting *Buckley*, 544 A.2d at 863).  New Jersey's

---

[14] Officer Howard correctly notes that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law . . . ." (Def.'s Br. at 16-17 (quoting N.J. Stat. Ann. § 59:3-3.))  However, it is apparent that a public employee whose behavior constitutes "a crime, actual fraud, actual malice or willful misconduct" under the auspices of N.J. Stat. Ann. § 59:3-14 cannot escape liability via the "good faith" proviso of N.J. Stat. Ann. § 59:3-3.

highest court has determined that such symptoms as mere
"aggravation, embarrassment, an unspecified number of headaches,
and loss of sleep[]" are insufficient as a matter of law to
establish the requisite level of emotional distress. *Buckley*,
544 A.2d at 864.

Here, without reaching the other elements of the IIED
analysis, there is insufficient evidence of severe emotional
distress to sustain this claim.  Apata has asserted only that he
fears the Willingboro police and thus hesitates to leave his home
at times, along with his claim of damage to his reputation.
Apata has not testified to a widespread fear of police or the
public in general--he only fears the local police force.  His
concerns have not prevented him from obtaining employment outside
the home--he reports six different employers since 2003.  (Def.'s
Ex. I ¶ 3.)  The troubles Apata cites amount to no more than
legally insufficient aggravation and embarrassment.  As no
reasonable factfinder could disagree that the requisite emotional
distress is lacking, the Court will grant summary judgment to
Officer Howard as to Count VIII.

## C.

Finally, Count VII alleges malicious prosecution against
Troy Davis for filing an affidavit that contributed to Apata's
June 27 arrest for terroristic threats.  Under New Jersey law, a
malicious prosecution plaintiff must establish all four of the

following to succeed: "(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." *Helmy v. City of Jersey City*, 836 A.2d 802, 806 (N.J. 2003) (citing *Lind v. Schmid*, 337 A.2d 365, 368 (N.J. 1975)).  The requirement that a criminal action was "terminated favorably" demands that a plaintiff show more than merely the absence of a conviction.  Instead, New Jersey appellate authority holds that "[t]here is no favorable termination where the complaint was withdrawn pursuant to an agreement of compromise with the accused." *Pascussi v. Twp. of Irvington*, 46 F.App'x 114, 116 (3d Cir. 2002) (quoting *Rubin v. Nowak*, 590 A.2d 249, 250-51 (N.J. Super. Ct. App. Div. 1991)).

The malicious prosecution claim by Apata against Davis fails because plaintiff cannot establish the fourth element, favorable termination.  Apata and Davis participated in a municipal court-administered mediation program subsequent to the events of June 26 and 27.  Stemming from that mediation, Apata and Davis reached an agreement that included the cessation of any efforts to prosecute Apata for terroristic threats.  This mediated settlement is a compromise with the accused, Apata, and cannot satisfy the fourth element of the New Jersey malicious prosecution cause of action as a matter of law.  Thus, Troy Davis

is entitled to summary judgment as to Count VII, malicious
prosecution.

**VI.**

For the reasons set forth above, the Court will grant in
part and deny in part Officer James Howard's Motion for Summary
Judgment and will grant Troy Davis's Motion for Summary Judgment.
Officer Howard's motion will be granted with respect to all
claims under §§ 1985 and 1986, the malicious prosecution claim,
and the state IIED claim.  Officer Howard's motion will also be
granted as to the § 1983 claims for excessive force, false
arrest, and false imprisonment insofar as those claims relate to
the June 26 investigatory stop or the June 27 arrest, but denied
to the extent those claims pertain to the June 26 disorderly
conduct arrest.  Likewise, Officer Howard's motion will be
granted as to the state assault and battery claim as it relates
to the June 26 investigatory stop, but denied insofar as it
pertains to the June 26 arrest.  Davis's motion will be granted
in its entirety.  The Court will issue an appropriate Order.


Dated:  September   23rd  , 2008


                          /s Joseph E. Irenas
                         **JOSEPH E. IRENAS, S.U.S.D.J.**